UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
GREENEVILLE DIVISION

| KIMBERLY D. REECE, | ) |
|---|---|
| Plaintiff, | ) |
| v. | ) 2:23-CV-00166-DCLC-CRW |
| DOE MOUNTAIN RECREATION AUTHORITY, *et al.*, | ) |
| Defendants. | ) |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Kimberly Reece sued Defendants Doe Mountain Recreation Authority ("DMRA"), its Executive Director Charles Ridlehuber, and Johnson County, Tennessee, for violations of the Fair Labor Standards Act, ("FLSA"), 29 U.S.C. § 201, *et seq.*, and the Age Discrimination in Employment Act, ("ADEA"), 29 U.S.C. § 621 *et seq*. Plaintiff seeks monetary damages, and, in the alternative, reinstatement of her employment [Doc. 14]. DMRA has filed a motion to dismiss, claiming that it is an arm of the State of Tennessee and therefore enjoys immunity from suit under the Eleventh Amendment to the United States Constitution [Doc. 20]. Reece has responded [Doc. 23]. The matter is now ripe for resolution.

**I.    BACKGROUND**

**A.    Doe Mountain Recreation Authority**

DMRA is a Tennessee public benefit corporation created by the Tennessee General Assembly in 2012. It provides outdoor recreational activities on 8,600 acres of land in Johnson County, Tennessee [Doc. 14, ¶¶ 2, 14, 27].  In creating the DMRA, the Tennessee General Assembly found there to be "an immediate need to conserve Doe Mountain … [which at that time

1

was] … under threat from economic distress….." Tenn. Code Ann. § 11-25-102(a)(1) (2012). The statute described DMRA as "performing a public function and to be a public instrumentality," Tenn. Code Ann. § 11-25-114(a), and declared DMRA to be for "a public and governmental purpose and a matter of public necessity." Tenn. Code Ann. § 11-25-114(a). The statute further provided that as a public corporation, no part of any of its net earnings could benefit any person. Tenn. Code Ann. § 11-25-114(b).

In DMRA's creation, the Tennessee General Assembly described DMRA as a "public body corporate and politic" and a "governmental entity," and set its termination date for June 30, 2029. Tenn. Code Ann. § § 11-25-103, 4-29-250(a)(6). It also included DMRA within its definition of the term "State." Tenn. Code. Ann. § 11-25-104(12). It gave DMRA the "the full range of … statutory powers … needed to ensure the success of Doe Mountain's conservation and to realize its full economic potential for the citizens of this state…." Tenn. Code Ann. § 11-25-102(a)(4).

By statute, DMRA is governed by a board of directors consisting of 15 members. These members are appointed by state and local political leaders: the governor, the mayor of Johnson County, the speaker of the house of representatives, and the local governing body of Johnson County all have the power to appoint directors to DMRA's board. Other directors serve by virtue of being a commissioner of certain state agencies. Tenn. Code Ann. § 11-25-106(a). These directors, officers, and employees are considered "officers of the state … and as such have the full measure of governmental immunity provided by law." Tenn. Code Ann. § 11-25-109(f)(1)–(2)(A)(2014). But DMRA can "sue or be sued and…prosecute and defend, at law or in equity, in any court having jurisdiction of the subject matter and of the parties…." Tenn. Code Ann. § 11-25-107(a)(2). The statute also authorizes Johnson County to "assign or loan any of its employees…for the use of the authority…." Tenn. Code Ann. § 11-25-111(a).

2

All meetings of DMRA must be open to the public pursuant to the Open Meetings Act. Tenn. Code Ann. § 8-44-102. Any bonds issued by DMRA are deemed "securities issued by a public instrumentality or a political subdivision of the state." Tenn. Code Ann. § 11-25-114(a). Upon dissolution, the title to all properties owned shall vest with the state. Tenn. Code Ann. § 11-25-118.

B.     Factual Background

On August 2, 2021, Tate Davis, DMRA's executive director, hired Reece as a full-time office assistant. She was 57 years old at the time [Doc. 14, ¶ 28]. DMRA quickly promoted her to "Administrative Manager" [Doc. 14, ¶ 30]. When Davis resigned a few weeks later, DMRA hired a new Executive Director, who wanted to reorganize the staff [Doc. 14, ¶ 32]. In October 2021, DMRA's board approved the reorganization; Reece's title changed to Office and Finance Manager, and she became a salaried, rather than hourly, employee [Doc. 14, ¶ 32].

Things seemed to proceed in normal course until June 2022 when DMRA's board approved raises for several of its employees, but not for Reece [Doc. 14, ¶¶ 33, 34]. Reece alleges that the employees who received raises were all "substantially younger" than her [Doc. 14, ¶ 35]. This did not sit well with Reece. On July 11, 2022, Reece emailed the executive director and the board members, complaining that DMRA "was not properly classifying employees as exempt or non-exempt" under FLSA [Doc. 14, ¶ 38]. She alleged that the executive director told the hourly employees not to record more than 40 hours of work even if their hours exceeded that amount [Doc. 14, ¶ 39]. She also noted that the hourly employees were not paid for their overtime in violation of FLSA [Doc. 14, ¶ 40]. Finally, she noted that the two oldest employees—herself included—were not given a raise [Doc. 14, ¶ 41]. After that email, on August 22, 2022, DMRA terminated Reece's employment [Doc. 14, ¶ 42]. She was 58 years old [Doc. 14, ¶ 44].

3

Within a few weeks of terminating Reece's employment, DMRA advertised for an Administrative Assistant position, the duties for which, Reece alleges, included many of the same duties she performed [Doc. 14, ¶ 45]. DMRA hired a woman in her early 20s to fill that position [Doc. 14, ¶ 47]. Reece thereafter filed a complaint with the EEOC, and once she received a right to sue letter, filed this action.

In this lawsuit, Reece alleges that DMRA retaliated against her in violation of the FLSA and the ADEA for the complaints she made in her July 11, 2022, email (Count I and III) [Doc. 14, ¶¶ 51–59]. She also alleges in Count II that DMRA discriminated against her because of her age in violation of the ADEA [*Id.* at ¶¶ 60–68]. Finally, she asks for reinstatement in the event DMRA has Eleventh Amendment immunity [*Id.* at ¶¶ 75–78]. DMRA has moved pursuant to Fed. R. Civ. P. 12(b)(1) to dismiss all claims against it for lack of subject matter jurisdiction, claiming that the Eleventh Amendment immunizes it from suit as an arm of the state. [Doc 20].

## II. ANALYSIS

The Eleventh Amendment to the Constitution provides that "[t]he Judicial Power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend XI. This sovereign immunity divests federal courts of subject matter jurisdiction "when a citizen sues his own State unless the State waives its immunity or Congress abrogates that sovereign immunity." *Russell v. Lundergan-Grimes*, 784 F.3d 1037, 1046 (6th Cir. 2015). "Usually, a state seeking to assert sovereign immunity as a threshold defense will move to dismiss under Rule 12(b)(1)." *Does v. Whitmer*, 69 F.4th 300, 305 (6th Cir. 2023) (quotations and citations omitted). For immunity to protect an entity, that entity must be an "an arm of the state." *Ernst v. Rising,* 427 F.3d 351, 358 (6th Cir. 2005).

4

"When a Rule 12(b)(1) motion attacks a complaint's factual predicate, the court does not presume that the plaintiff's factual allegations are true." *Global Tech., Inc. v. Yubei (XinXiang) Power Steering Sys. Co.*, 807 F.3d 806, 810 (6th Cir. 2015) (internal citations and quotations omitted). Instead, "the court can actually weigh evidence to confirm the existence of the factual predicates for subject matter jurisdiction." *Id.* (internal citations and quotations omitted). "The party invoking federal jurisdiction has the burden to prove that jurisdiction." *Id.* "[T]he entity asserting Eleventh Amendment immunity has the burden to show that it is entitled to immunity, *i.e.*, that it is an arm of the state." *Gragg v. Kentucky Cabinet for Workforce Dev.*, 289 F.3d 958, 963 (6th Cir. 2002).

To determine whether an entity is entitled to Eleventh Amendment immunity as an "arm of the state," the Sixth Circuit employs the following factors: (1) the State's potential liability for a judgment against the entity; (2) the language by which state statutes and state courts refer to the entity and the degree of state control and veto power over the entity's actions; (3) whether state or local officials appoint the entity's board members; and (4) whether the entity's functions fall within the "traditional purview" of state or local government. *Ernst*, 427 F.3d at 359 (citing *Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30, 44–51 (1994)).

On the first factor, the parties disagree on whether Tennessee is potentially liable for a judgment entered against DMRA. DMRA contends that Tennessee will be liable because DMRA is a creation of state law, the state owns the reversion interest in DMRA's land, and Tennessee law provides a mechanism for DMRA to receive funding from state appropriations. [Doc. 21, pg. 7–8]. DMRA also highlights that Tennessee law classifies its board members and employees as officers of the State for purposes of both immunity and for satisfying judgments issued against them in their official capacity. [*Id.*].

5

Reece responds that Tennessee created DMRA as a "public nonprofit corporation" to shield itself from any of DMRA's potential liabilities. [Doc. 23, pg. 6]. She further avers that Tennessee granted DMRA the power to sue and be sued, and to enter contracts, deeds, and other instruments in its own name. [*Id.*]. This, Reece argues, shows that Tennessee intended DMRA not to be an arm of the state, but a separate entity. [*Id.*]. She also contends that Tennessee's mechanism for funding DMRA is irrelevant, as the primary funding mechanism is through local fees, and there is no evidence that State funds would be used to satisfy creditors. [*Id.* at 7–8]. Finally, she argues that Tennessee's classification of DMRA employees as state officials merely provides its officers with counsel and—under some circumstances—allows the State to pay judgments against them. [*Id.* at 8–9]. It does not, however, authorize payment of judgments against DMRA itself. [*Id.* at 9–10].

Although DMRA is a separate corporate entity, that does not change the sovereign immunity analysis in this case. It has long been held that "that the sovereign character of the state's ownership is not changed by the creation of the corporation…." *Knoxville Hous. Auth. v. City of Knoxville*, 123 S.W.2d 1085, 1088 (Tenn. 1939). And the Tennessee legislature was clear that DMRA was a "public body corporate and politic." Thus, it is a "public instrumentality of the state" despite having corporate powers. *Michigan v. United States*, 40 F.3d 817, 818 (6th Cir. 1994).

Reece contends there is no evidence that a judgment would have to be satisfied by state funds. But the Sixth Circuit has explained that "it is the state treasury's *potential* legal liability for the judgment, not whether the state treasury will pay for the judgment in *that* case, that controls the inquiry." *Ernst*, 427 F.3d at 359. (emphasis in original). Here if Reece is successful in obtaining a judgment against DMRA, then she could obtain a judgment lien against DRMA's

realty by registering a certified copy of the judgment and filing it in the register's office. *See* Tenn. Code Ann. §§ 25-5-101–109. Thus, the potential exists that the state could be liable for paying a judgment because the land held in DMRA's name will revert to Tennessee upon dissolution of the authority.

That DMRA is funded through fees also does not change matters. When the State bears ultimate responsibility for funding an entity—regardless of whether the entity funds itself during its existence—the State is ultimately liable for a judgment against the entity. For example, in *Ernst*, the Sixth Circuit concluded that Michigan's retirement system was an arm of the state when state statutes and the state constitution obliged Michigan to fund it. *Ernst*, 427 F.3d at 359–60. And in *Kreipke v. Wayne State Univ.*, the Sixth Circuit reached the same conclusion where "the constitution and statutory law [made] the state of Michigan responsible for funding [Wayne State University]." 807 F.3d 768, 776–77 (6th Cir. 2015).[1] Here, Tenn. Code. Ann. § 11-25-111 provides the funding mechanism for DMRA. That section allows adjoining or adjacent counties to contribute funds to DMRA to fuel its operating expenses. *Id.* But it also allows the General Assembly to appropriate general fund tax revenue to DMRA to finance "administrative costs" as well as "the cost of any general plan, improvement, project, program, or work benefiting [DMRA]." *Id.* Thus, while Tennessee may not have a constitutional obligation to fund DMRA, the Tennessee legislature plainly contemplated funding DMRA with state treasury funds. Finally, Tenn. Code Ann. § 11-25-118 provides that in the event of DMRA's dissolution, DMRA assets cannot be distributed to any person other than a governmental entity.

---

[1] In contrast, where the state's liability for a judgment rests solely on its willingness to reimburse an entity for a judgment entered against it, the state is not considered to be legally liable for the judgment. *Lowe v. Hamilton Cnty. Dep't of Job & Fam. Servs.*, 610 F.3d 321, 325–26 (6th Cir. 2010).

If a judgment against DMRA is entered that DMRA cannot satisfy, Tennessee will be forced to fund DMRA with tax revenues or allow its closure. And in the event of its closure, a "governmental entity" must bear any costs. Tenn. Code Ann. § 11-25-118. For these reasons, the Court concludes that Tennessee is *potentially* liable for a judgment entered against DMRA in this case.

The second factor focuses on how state statutes refer to the entity and the degree of state control over it. DMRA maintains that these statutes characterize it consistently as an arm of the state. Reece responds that Tennessee statutes created DMRA as a separate, nonprofit corporation, indicating that DMRA is not an arm of the State. [Doc. 23, pg. 10]. Further, Reece notes that DMRA has the power to sue and be sued, as well as to enter into contracts, and it must do so in its own name. [*Id.* at 10]. According to Reece, these powers indicate that DMRA is not an arm of the State, but a separate entity.

On this factor, Tennessee state statutes refer to DMRA as a "public instrumentality," serving a "governmental purpose." Tenn. Code Ann. § 11-25-114(a). They further describe it as a "governmental entity" and a "public body corporate and politic." Tenn. Code Ann. § 11-25-103. Tennessee subjects DMRA to annual audit and review. Tenn. Code Ann. § 11-25-113. Further, DMRA is subject to ongoing sunset review and to the Open Meetings Act, and Tennessee law controls who is appointed to DMRA's board of directors. Tenn. Code Ann. §§ 4-29-250, 8-44-102, 11-25-106.

This statutory language supports the conclusion that DMRA is an arm of the State. First, all of DMRA's powers are statutorily vested. *See* Tenn. Code Ann. § 11-25-102. Further, Tenn. Code Ann. § 11-25-109(f)(1) classifies members of DMRA as "officers of the state" and provides them with "the full measure of governmental immunity provided by law." And, at various points

8

in the relevant chapter, the Tennessee legislature declared DMRA "a public instrumentality," "to be performing a public function," and "a public body." Tenn. Code Ann. §§ 11-25-114, 117. While it is true that Tennessee created DMRA with a unique structure, the relevant statutes make clear at every juncture that DMRA is more like a state agency than a private corporation.

Further, Tennessee exercises significant control over DMRA. Tennessee law provides the mechanisms for DMRA's structure and internal governance, its purpose, and affords its officers and directors all their powers. State law requires DMRA to maintain open proceedings. Tenn. Code Ann. § 11-25-109. And Tennessee law subjects DMRA's very existence to an end date. Tenn. Code Ann. § 4-29-250(a)(6). While Plaintiff may be correct that DMRA's board and officers have significant latitude to operate DMRA, they are required to do so within stringent bounds derived from the State. Accordingly, this factor weighs in favor of the finding that DMRA is an arm of the State.

On the composition of DMRA's board, the parties argue over what degree of state control the method of board appointees evinces. The reality is quite simple. Of DMRA's 15 board members, 10 are appointed by the State. Tenn. Code Ann. § 11-25-106. Reece is correct that DMRA's board is composed of a diverse group appointed by several entities, but this is immaterial. [Doc. 23, pg. 11–12]. Two-thirds of the Board is State-appointed. This factor weighs in favor of concluding that DMRA is an arm of the State.

Finally, DMRA maintains that it also serves an important governmental interest [Doc. 21, pg. 9–10]. DMRA argues that Tennessee created it to preserve natural resources, and that this is traditionally the function of a State—not local—government. The States have long been empowered to preserve natural resources within their borders. *See Geer v. Connecticut*, 161 U.S. 519, 527–28 (1896) (noting that the colonies possessed authority over the wildlife within their

9

borders at common law, and that the authority passed to the States at ratification), *overruled on other grounds by Hughes v. Oklahoma*, 441 U.S. 322 (1979). And while there have been disputes over whether the regulation of natural resources is the function of state or federal governments, there is no doubt that States maintain a vested interest in conserving lands and resources within their borders. Localities can and often do create parks and conservation areas. But traditionally, states maintained the authority to preserve their lands and wildlife. Therefore, given that the purpose of DMRA is preservation and conservation, the function of the DMRA is more akin to that of a State than a locality. This factor, too, weighs in favor of Eleventh Amendment immunity.

There are three exceptions to Eleventh Amendment immunity. First, a state can waive its immunity by consenting to suit. *Skatemore, Inc. v. Whitmer*, 40 F.4th 727, 733 (6th Cir. 2022). Second, Congress can expressly abrogate the states sovereign immunity in exercise of their Fourteenth Amendment enforcement powers. *Ernst*, 427 F.3d at 358. And third, the doctrine of *Ex Parte Young* allows suits against government officials to enjoin them from violations of federal law. *Id.*

The first exception does not apply here. There has been no argument that Tennessee waived its immunity expressly or through its conduct in litigation. And Tennessee law expressly codifies its immunity from suit. *See* Tenn. Code Ann. § 20-13-102(a).

The second exception also does not apply. Neither the FLSA nor the ADEA abrogated state sovereign immunity. *Kimel v. Florida Bd. of Regents*, 528 U.S. 62, 66 (2000) (ADEA did not abrogate state sovereign immunity without the State's consent); *Latham v. Office of Atty Gen. of State of Ohio*, 395 F.3d 261, 270 (6th Cir. 2005); *Alden v. Maine*, 527 U.S. 706, 712 (1999) (same with respect to the FLSA).

10

And finally, the doctrine of *Ex Parte Young* does not apply to DMRA. *Ex Parte Young* authorizes only injunctive relief to prevent a state official from violating federal law. *Ernst*, 427 F.3d at 358. That is not the kind of relief sought against DMRA, and DMRA is not a state official.

## III. CONCLUSION

Because all four factors weigh in favor of finding that DMRA is an arm of the State, it is entitled to Eleventh Amendment immunity. No exceptions to that doctrine apply. Accordingly, the Court has no subject matter jurisdiction over the claims against DMRA. DMRA's Motion to Dismiss [Doc. 20] is **GRANTED**, and DMRA is **DISMISSED** from this case.

**SO ORDERED:**

s/Clifton L. Corker
United States District Judge

11

Case 2:23-cv-00166-DCLC-CRW   Document 32   Filed 03/24/25   Page 11 of 11
PageID #: 245